**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LATOYA JOHNSON, | )  Case No.: 1:14-cv-001841 – JLT |
| | ) |
| Plaintiff, | )  ORDER GRANTING IN PART AND DENYING IN |
| | )  PART DEFENDANTS' MOTION FOR |
| v. | )  SUMMARY JUDGMENT |
| | ) |
| GOLDEN EMPIRE TRANSIT DISTRICT | )  (Doc. 43) |
| and TODDASH KIM, | ) |
| | ) |
| Defendants. | ) |

Plaintiff LaToya Johnson is a former employee of Defendant Golden Empire Transit District. Plaintiff contends she was discharged from her employment after suffering a knee injury that rendered her unable to perform her job duties as a bus driver, and taking medical leave.  Accordingly, Plaintiff asserts the company and Toddash Kim, an operations supervisor, are liable for a violation of the Family and Medical Leave Act, 29 U.S.C. § 2615 and that GET is liable for discrimination in violation of the California Family Rights Act, discrimination based upon disability and failure to accommodate in violation of California's Fair Employment and Housing Act, and failure to take reasonable steps to prevent discrimination.

Defendants assert Plaintiff is unable to succeed on her claims, and seek summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Doc. 43)  The Court heard the oral arguments of the parties on June 21, 2016.  For the reasons set forth below, Defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

I.      **Undisputed Material Facts**[1]

In October 2012, Plaintiff was employed by Golden Empire Transit District as a bus driver with a Class B license.  (JSF 1; Doc. 46-2 at 2, Johnson Decl. ¶ 1)  She drove "a bus known as a Get-a-lift bus that does not have regular routes," but instead picked up and dropped off customers at specific locations.  (Doc. 46-2, Johnson Decl. ¶ 3)

While working on December 26, 2013, Plaintiff went to the apartment complex of her fiancé's sisters where she parked the Get-a lift bus.  (Doc. 46-2 at 3, Johnson Decl. ¶ 5)  According to Plaintiff, she had previously parked at the apartment complex and had spoken to the apartment manager to obtain permission to park there.  (*Id.*)  Plaintiff reports she "punched a code to dispatch indicating [she] was exiting the bus," and left the bus to eat.  (*id.*)  She contends that when she returned, she turned on the bus—leaving "the key in the position of allowing the electrical system to work by without the engine running—and punched in a code to inform dispatch of Plaintiff's return.  (*Id.*)  Plaintiff contends she then "exited the bus and stood outside, had a cigarette, and waited by the bus until [she] was ready to leave, which occurred approximately 45 minutes later."  (*Id.*)  The same day, Plaintiff suffered a knee injury while "helping a big customer in a wheelchair."  (*Id.* at 4, ¶ 8)  Plaintiff visited a GET doctor, who "took [her] off work for two weeks."  (*Id.*)

Plaintiff was asked to return to a modified duty assignment—that accommodated her knee injury--on January 9, 2014.  At that time, Crystal Hamlet, GET's Human Resources Administrative Assistant, gave Plaintiff a document which stated:

> We have received information from your treating physician that you have been released to temporary alternate work.  The Golden Empire Transit District's modified duty program enables you to remain safely in the workforce while you are recovering from your medical condition.
>
> We have chosen modified duty assignments for you that are within your physician's guidelines.  However, if you consider any of the alternate tasks to be beyond your physical capabilities, immediately report your concerns to your supervisor.  Since you are the best judge of your physical abilities, you must take responsibility for staying within the physician's restrictions.

(Doc. 46-3 at 20)  GET indicated that while on modified-duty, Plaintiff would be "in a classroom

---

[1] The parties prepared a "Joint Statement of Undisputed Facts" (Doc. 43-3), and any facts from the Joint Statement will be identified as "JSF."  In addition, Defendant prepared a separate statement of facts (Doc. 43-2), to which Plaintiff filed a response (Doc. 46-1).  Defendants' undisputed facts will be identified as "DUF."

2

setting training on the new routes," and after she completed training, GET would "conduct orientation meetings on how to interact with the public during outreach." (*Id.*)  Plaintiff signed the document, after which Ms. Hamlet directed Plaintiff to go see Toddash Kim, another employee of GET.  (*Id.*; Doc. 46-3 at 4, Johnson Decl. ¶ 9)

Plaintiff reports that Mr. Kim gave her a letter indicating it was "[a] pre-disciplinary review, that may result in discipline up to and including termination," because she "received her 5th discipline on a five step discipline track." (Doc. 46-3 at 5)  GET had a progressive discipline policy, under which GET had the right to terminate an employee who "has violations in a particular track within a floating 12 month period." (JSF 12)  Before December 26, 2013, the plaintiff had been the subject of prior disciplinary actions.  For example, on December 22, 2012, Plaintiff received an Employee Discipline Report for running over a center divider, and admitted she committed the violation.  (Doc. 43-4 at 13, 171)

On April 9, 2013, Plaintiff received an Employee Discipline Report for failing to be at work on time, and she was given a written warning.  (JSF 5; Doc. 43-4 at 15, 172)  On October 4, 2013, Plaintiff received an Employee Discipline Report for being "late for duty." (JSF 6; Doc. 43-4 at 33)  Plaintiff received a "[t]hird written warning, resulting in one day off without pay." (*Id.*)  Plaintiff admitted she committed the violation of the GET policy, which required operators to clock in "by the start time of the assigned shift." (JSF 7; *see also* Doc. 43-4 at 34)

On October 15, 2013, Plaintiff "called at the time she was due to check in and informed dispatch [that] she didn't have a car to come to work," and Plaintiff arrived at work two and half hours late.  (Doc. 43-4 at 37, 177)  She received an Employee Discipline Report on October 16, which indicated it was Plaintiff's "[f]inal written warning, resulting in three days off without pay." (JSF 8; Doc. 43-4 at 37, 177)  Despite this, in November 2013, Plaintiff "failed to attend one of seven mandatory safety meetings beginning November 1 through 11th." (Doc. 43-4 at 41)  The Employee Discipline Report indicated that the "[c]urrent action being [t]aken" was discharge, and it was "pending." (*Id.*)  However, Plaintiff testified that Mr. Kim said she could attend a make-up safety meeting at a later date, and if Plaintiff did so then she would not receive a disciplinary write-up.  (Doc. 46-3 at 41, Johnson Depo. 83:23-25)

During her employment, Plaintiff "was a member of the Teamster Local #517 Creamery Employees and Drivers Union, Public Professional and Medical Employees Union." (JSF 3)  As a Union member, Plaintiff "was bound by [a] Collective Bargaining Agreement from the period from April 1, 2012 through March 31, 2014." (JSF 4)  The CBA allowed the union to grieve discipline imposed on the employees but did not allow the employee to grieve the discipline otherwise. (Doc. 43-4 at 218.)

The letter given by Mr. Kim to the plaintiff on January 9, 2014, was signed by Operations Manager Candra Cheers. (Doc. 46-3 at 5)  The letter indicated the last violation Plaintiff committed was leaving the bus "unattended for over an hour" on December 26, 2013. (*Id.*)  Also, the letter from Ms. Cheers indicated:

> Upon review you were observed pulling into an apartment complex and parking the vehicle to conduct activity of a personal nature.  This is a violation of the Golden Empire Transit Coach Operator Procedural Manual and is listed as the fifth discipline on your five step discipline track, resulting in suspension pending a pre-disciplinary review.

(Doc. 46-3 at 5)  During the meeting, Plaintiff informed Mr. Kim the charge "was untrue," that she "did not leave [the] bus unattended for over an hour on that date." (Doc. 46-2 at 4, Johnson Decl. ¶ 10)  Plaintiff was informed she had "the right to respond to the charges either in writing or orally and to be represented at the review by a person of [her] choice." (Doc. 46-3 at 5)  Plaintiff did not respond. (DUF 8, 16)

On January 22, 2014, Plaintiff received a letter from Ms. Cheers, who informed her that a pre-disciplinary review meeting would be held on January 27, 2014. (JSF 13)  Plaintiff, Ms. Cheers, Union representative Gary Jenkins, and David Epperson attended the meeting, during which Plaintiff was "advised that GET was considering whether to terminate her employment due to the claimed violations" addressed in the Employee Discipline Reports dated April 9, 2013; October 4, 2013; October 16, 2013; November 19, 2013; and January 9, 2014. (DUF 13, 14)

On February 3, 2014, Candra Cheers drafted and mailed a letter informing Plaintiff that "her employment with GET had been terminated due to her violation of GET's progressive discipline policy." (JSF 14; Doc.43-4 at 3, Cheers Decl. ¶ 18)  Specifically, Ms. Cheers identified the following violations in Employee Discipline Reports from March 2013 through January 2014:

- 03/31/13- Operator failed to report for work or call in
- 10/04/13- Operator was five minutes late for duty
- 10/12/13- Operator failed to give an hour notice before calling in and showed up 2 ½ hours late.
- 11/1/13- Operator failed to attend one of seven mandatory safety meeting[s].
- 01/09/14- Operator drove to an apartment complex and left the paratransit bus unattended for over an hour.

(Doc. 43-5 at 194) This action followed.

## II.    Evidentiary Objections

Pursuant to Rule 56(c) of the Federal Rules of the Civil Procedure, "an affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *See also Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001) (holding that it was an abuse of discretion for the district court, at the summary judgment stage, to consider information from an affidavit based on inadmissible hearsay rather than the affiant's personal knowledge).

### A.    Objections to Plaintiff's Declaration

#### 1.    Paragraph 3, Lines 23 through 26

In the declaration, Plaintiff reported:

What drivers have done during [their] down time since I began working at GET involves any number of things, including stopping at a restaurant for lunch, stopping in a parking lot and engaging in personal matters such as reading or talking on a cell phone, going to the next pick up and parking nearby on the street, among other things.

(Doc. 46-2 at 2, ¶ 3)  Defendants object this statement is hearsay and lacks foundation.  (Doc. 47-2 at 2, citing *United States v. Tanner*, 628 F.3d 890, 903 n.5 (7th Cir. 2010))

Significantly, Plaintiff reported that her instructor had them stop at a local restaurant for a meal break on one occasion during training.  (Doc. 46-2 a 2, ¶ 3)  To that extent, Defendants' objection is **OVERRULED**.  On the other hand, Plaintiff does not assert that she personally witnessed other drivers reading or talking on phones.  (*See id.* at 2-4, ¶¶ 3, 6)  The Court is unable to determine this portion of the statement is based upon Plaintiff's personal knowledge, and the source of the information is unclear.  Consequently, the statement concerning drivers reading and talking on cell phones while stopped in parking lots is inadmissible hearsay, and Defendants' objection thereto is **SUSTAINED**.

#### 2.    Paragraph 6, Lines 1 through 2

1    Plaintiff reported, "I discussed with other drivers at GET the fact that they stopped during down

2 time at stores, restaurants, on streets, or anywhere just as long as it did not interfere with our routes."

3 (Doc. 46-2 at 4, ¶ 6)  Defendants object to Plaintiff's statement as hearsay and lacking foundation.

4 (Doc. 47-2 at 2)

5    Hearsay statements are those "(1) the declarant does not make while testifying at the current

6 trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the

7 statement." Fed. R. Evid. 801(c).  Here, Plaintiff is offering statements made by other unidentified

8 individuals to explain her subsequent conduct.  Notably, she explains that she was trained that she

9 could park at various locations for "down time" and other drivers told her they stopped at various

10 locations for "down time" and, as a result, she stopped at these various locations for "down time."

11 Therefore, Defendants' objection on the grounds of hearsay is **OVERRRULED**.

12           3.      Paragraph 8, Lines 18 through 19

13    Plaintiff reported that after her injury, a physician took her off work for a two-week period "but

14 indicated that [Plaintiff] could engage in light or modified duty work."  (Doc. 46-2 at 4, ¶ 8)

15 Defendants object to the report of what the physician said as hearsay.  (Doc. 47-2 at 2)

16    The statement was made by an unidentified physician, and offered as evidence that Plaintiff

17 was able to perform light or modified duty.  Plaintiff's statement regarding what she was told by the

18 physician is inadmissible hearsay.  *See* Fed. R. Evid. 801(c); *Crayon v. Hill*, 2016 U.S. Dist. LEXIS

19 7723 at * 23 (E.D. Cal. Jan 22, 2016) (holding the plaintiff's testimony regarding what a doctor at told

20 him was "hearsay and cannot be properly considered in opposition to a summary judgment motion").

21 Accordingly, Defendants' objection is **SUSTAINED**.

22           4.      Paragraph 10, Lines 3 through 4

23    Plaintiff asserted she was awaiting a full knee replacement and stated, "I am advised that I will

24 be able to drive as Class B driver after such surgery."  (Doc. 46-2 at 5, ¶ 10)  Defendants object that

25 this statement is hearsay, lacks foundation, and is speculative.  (Doc. 47-2 at 2)

26    Significantly, the statement Plaintiff refers to was made by an unidentified third party, and

27 Plaintiff offers the statement as evidence that she will be able to perform her former job duties.  Thus,

28 it is inadmissible hearsay. *See* Fed. R. Evid. 801(c); *Crayon*, 2016 U.S. Dist. LEXIS 7723 at *23.

6

1   Therefore, Defendants' objections to the statement are **SUSTAINED**.

2           5.      Paragraph 12, Lines 15 through 19

3           Plaintiff asserted at she had various supervisors during the time she worked for GET, but "the

4   ultimate supervisor over the bus drivers was Toddash Kim." (Doc. 46-2 at 5, Johnson Decl. ¶ 12)  In

5   addition, she asserts:

6           [Mr. Kim] was the person who was involved in discipline of drivers and is the person
            who is responsible for telling me I was suspended due to the alleged abandonment of
7           my bus for over an hour on 12/26/13.  Mr. Kim was involved in the major decisions
            relating to bus drivers.

8

9   (*Id.*)  Defendant objects to each of these sentences, asserting they are hearsay and lack foundation of

10  Plaintiff's personal knowledge. (Doc. 47-2 at 2)

11          Importantly, Plaintiff has not set forth any facts to show she has personal knowledge of whether

12  Mr. Kim was the "ultimate supervisor" or involved in disciplinary decisions related to other bus

13  drivers.  For example, Plaintiff does not assert she has personal knowledge of Mr. Kim disciplining

14  other drivers, or how he supervised the drivers at GET.  Therefore, Defendants' objections to the

15  statements in lines 15 to 16 and 18 to 19 are **SUSTAINED**.

16          On the other hand, Plaintiff asserts the day she returned from her leave, she was told to see Mr.

17  Kim, who informed Plaintiff she was suspended.  (Doc. 46-2 at 4, ¶ 9)  Thus, Plaintiff stated facts

18  sufficient to show a personal knowledge that Mr. Kim was "responsible" for telling Plaintiff that she

19  was suspended from GET.  To the extent that Defendants object to the report that Mr. Kim told Plaintiff

20  she was suspended as hearsay, an opposing party's statement offered against that party is not

21  considered hearsay. Fed. R. Evid. 801(d)(2)(A). Likewise, statements offered against a party that were

22  made by the party's agent or employee on a topic that is within the scope of the employment

23  relationship, are excluded from the hearsay rule. Fed. R. Evid. 801(d)(2)(D). Accordingly, Defendants'

24  objections to this statement are **OVERRULED**.

25      **B.      Objections to the Declaration of Randy Rumph**

26          Defendants object to several statements in the declaration of Randy Rumph related to exhibits to

27  attached to his declaration.  (Doc. 47-2 at 3-4)  Mr. Rumph is counsel for Plaintiff, as noted in his

28  declaration, and identified documents "provided to Plaintiff during discovery" that were attached as

7

exhibits to his declaration, such as a computer printout of Plaintiff's logins from her bus, the letter from GET related to modified job duties following leave, and a letter about her suspension. (*See* Doc. 46-3 at 2-3, ¶¶ 1-7).

According to Defendants, Mr. Rumph's statements are hearsay, lack foundation, and are improper authentication of the documents. (Doc. 4-2 at 3-4)  However, Defendants fail to explain why the documents are "hearsay," and Mr. Rumph clearly has personal knowledge of what documents were produced by Defendants during the course of discovery.  Because the documents—produced by the defendants—are now offered by Plaintiff, they are deemed authentic.  *See Maljack Prods., Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 889 n.12 (9th Cir. 1996) (documents produced by a party in discovery were deemed authentic when offered by the party-opponent); *Snyder v. Whittaker Corp.*, 839 F.2d 1085, 1089 (5th Cir. 1988) (same).  Consequently, Defendants' objections to the declaration of Mr. Rumph are **OVERRULED**.

### C.    Plaintiff's Objections as to Relevance

Previously, this Court observed that "attorneys routinely raise every objection imaginable without regard to whether the objections are necessary, or even useful, given the nature of summary judgment motions in general, and the facts of their cases in particular." *Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006).  Plaintiff objects to several of the facts identified by Defendants as irrelevant and asserts they are not "issue[s] of material fact." (*See generally* Doc. 46-1 at 3-14)  However, such objections are inappropriate, because the Court must determine whether a fact is relevant and material as part of "the summary judgment standard itself." *See id.*  Accordingly, Plaintiff's objections on these grounds are **OVERRULED**.

### D.    Conclusion

To the extent that statements offered by either party are speculative or represent a legal conclusion, the Court, as a matter of course, will not factor that material into the analysis. *See Burch*, 433 F. Supp.2d at 1119  ("[S]tatements in declarations based on speculation or improper legal conclusions, or argumentative statements, are not *facts* and likewise will not be considered on a motion for summary judgment. Objections on any of these grounds are simply superfluous in this context.") (citation omitted, emphasis in original).  Rather, the Court's analysis relies on evidence only that it has

1  deemed admissible.

2  **III.      Legal Standards for Summary Judgment**

3          The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to

4  see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*,

5  475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment is appropriate when there is "no

6  genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

7  R. Civ. P. 56(a).  In addition, Rule 56 allows a court to grant summary adjudication, or partial summary

8  judgment, when there is no genuine issue of material fact as to a particular claim or portion of that

9  claim. Fed. R. Civ. P. 56(a); *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981)

10 ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a

11 single claim . . .") (internal quotation marks and citation omitted).  The standards that apply on a

12 motion for summary judgment and a motion for summary adjudication are the same.  *See* Fed. R. Civ.

13 P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

14         Summary judgment, or summary adjudication, should be entered "after adequate time for

15 discovery and upon motion, against a party who fails to make a showing sufficient to establish the

16 existence of an element essential to that party's case, and on which that party will bear the burden of

17 proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the "initial

18 responsibility" of demonstrating the absence of a genuine issue of material fact.  *Celotex,* 477 U.S. at

19 323.  An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find

20 for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the

21 governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem*

22 *Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987).  A party demonstrates summary adjudication is

23 appropriate by "informing the district court of the basis of its motion, and identifying those portions of

24 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits,

25 if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex*, 477

26 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

27         If the moving party meets its initial burden, the burden then shifts to the opposing party to

28 present specific facts that show there is a genuine issue of a material fact.  Fed R. Civ. P. 56(e);

*Matsushita*, 475 U.S. at 586.  An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Id.* at 587.  The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exits.  *Id.* at 586 n.11; Fed. R. Civ. P. 56(c).  Further, the opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987).  However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.

The Court must apply standards consistent with Rule 56 to determine whether the moving party demonstrated there is no genuine issue of material fact and judgment is appropriate as a matter of law.  *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).  In resolving a motion for summary judgment, the Court can only consider admissible evidence.  *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)).  Further, evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party.  *Orr*, 285 F.3d at 772; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

## IV.    Discussion and Analysis

### A.    Interference with Rights under the FLMA

Plaintiff alleges GET and Toddah Kim interfered with her rights under the Family Medical Leave Act of 1993.  (Doc. 1 at 3)  Specifically, she claims that the defendants terminated her because she took FMLA leave.  *Id.*

A substantive right under the FMLA prevents an employer from interfering with the exercise of the employee's right to take leave.  29 U.S.C § 2615(a); 29 C.F.R. § 825.220(a). Specifically, pursuant to the FMLA, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided." 29 U.S.C. § 2615(a). Interference with an employee's rights "include[s], for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220. Likewise, the employer may not "discriminat[e] or

retaliate[e] against an employee or prospective employee for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c).  Thus, the FMLA prohibits an employer from the use of FMLA-protected leave as "a negative factor" in employment decisions.  29 C.F.R. § 825.220(c); *see also Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001) ("attaching negative consequences to the exercise of protected rights surely 'tends to chill' an employee's willingness to exercise those rights," and employees are less likely to take FMLA leave "if they can expect to be fired or otherwise disciplined for doing so").

The Ninth Circuit does not apply burden-shifting framework to interference claims.  Rather, a plaintiff must simply prove her case with "either direct or circumstantial evidence" of interference. *Bachelder*, 259 F.3d at 1125.  The Court explained: "The regulation promulgated by the Department of Labor, 29 C.F.R. 825.220(c) plainly prohibits the use of FMLA-protected leave as a negative factor in an employment decision." *Id.*  Therefore, "[i]n order to prevail on her claim… [a plaintiff] need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her." *Id.*  On summary judgment, the Court must determine "whether there is a triable issue of material fact as to whether the FMLA leave taken by [the plaintiff] was impermissibly considered as a factor in" the adverse employment actions she experienced.  *Liu v. Amway Corp.*, 347 F.3d 1125, 1136 (9th Cir. 2003).

### 1.        Liability of Toddash Kim

Defendants contend Plaintiff is unable "to establish Defendant Kim's individual liability under the FMLA Claim."  (Doc. 43-1 at 11, emphasis omitted).  According to Defendants, Kim does not qualify as an "employer" for purposes of the FMLA, and as such the claim fails.  (*Id.* at 11-13)  On the other hand, Plaintiff argues that Kim was her supervisor and may be held liable under the FMLA. (Doc. 46 at 22-24)

Pursuant to the FMLA, the term employer includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. §2611(4)(A)(ii)(I). Under this definition of "employer," supervisors and corporate officers may be held individually liable under the FMLA. *Hibbs v. Dep't of Human Resources*, 273 F.3d 844, 872 (9th Cir. 2001) (indicating the Court "agree[d] with the other circuits that some supervisory employees can be sued as employers

11

under the FMLA"); *see also Modica v. Taylor*, 465 F.3d 174, 186 (5th Cir. 2006); *Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 414 (3d Cir. 2012).  In agreeing with its sister circuits, the Ninth Circuit noted the similarity between the definitions of "employer" under the Fair Labor Standards Act and the FMLA.  *Id.*, 273 F.3d at 872 (citing, *e.g., Wascura v. Carver*, 169 F.3d 683, 685-87 (11th Cir. 1999) (discussing § 2611(4)(A)(ii)(I) and case law interpreting identical language in the FLSA)). Accordingly, the Court employs the same "economic reality" test to determine whether an individual is an employer under the FMLA and the FLSA.  *Mercer v. Borden*, 11 F. Supp. 2d 1190, 1191 (C.D. Cal. 1998); *see also Moreau v. Air France*, 356 F.3d 942, 946-47 (using the same "economic realities" test for determining joint employment in the context of FMLA, as it would under the FLSA).

Courts consider four factors to determine the "economic realities" of an employment relationship: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983).  Consequently, "where an individual exercises 'control over the nature and structure of the employment relationship,' or 'economic control' over the relationship, that individual is an employer … and is subject to liability." *Lambert v. Ackerley*, 180 F.3d 997, 1012 (9th Cir. 1999) (finding the CEO and COO were employers under the FLSA where they had a significant ownership interest, operational control over significant aspects of the company's day-to-day functions, power to hire and fire employees, power to determine salaries, and the responsibility to maintain employment records); *Boucher v. Shaw*, 572 F.3d 1087, 1091 (9th Cir. 2009) (finding an individual defendant responsible for handling labor and employment matters, who also held 30% ownership over a company, was an "employer"); *Solis v. Best Miracle*, 709 F. Supp. 2d 843, 847 (E.D. Cal. 2010) (finding a manager who had authority to hire and fire employees, instructed employees to falsify time cards, maintained employment records, filled out time and wage sheets, signed paychecks, and "paid all the bills" was an "employer" under the FLSA).

Plaintiff contends Kim is an employer under the FMLA because he "was Plaintiff's supervisor," and "[h]is title was/is 'operations supervisor.'"  (Doc. 46 at 23)  Plaintiff observes that when Kim

testified as to his job duties:

> Q.   What are your job duties as operations supervisor?
>
> A.   I oversee the transportation supervisors, dispatch, review complaints, interviews, disciplines. I monitor -- well, there's a whole list. Everything?
>
> Q.   Yes.
>
> A.   I monitor the -- currently the uniform spreadsheets, driver call-in-sick slips, timekeeping for dispatch, also supervisors. I do retraining for the coach operators. I do final sign off for the new hires. I assist the HR department, marketing department. Whatever needs there may be.

(*Id.*, quoting Doc. 46-3 at 70, Kim Depo. 7:24- 8:10)  In addition, Plaintiff contends "Kim was involved in disciplining Plaintiff," and "the decision maker (Cheers) relied solely on him when she prepared Plaintiff's notice of suspension on January 22, 2015." (*Id.*, citing Cheers Depo. 54-57)

      Significantly, Plaintiff presents no evidence that Kim "supervised and controlled" the work schedules for GET bus drivers, determined the rate of pay the bus drivers would receive, or maintained all employment records for the bus drivers.  Rather, Kim testified his "supervision" of the bus drivers was limited to call-in-sick slips and re-training.  (Doc. 46-3 at 70, Kim Depo. 7:24- 8:10)  Though Kim reported he did "a final sign off for the new hires," it is unclear whether he meant these "new hires" were all GET employees—thereby including bus drivers such as Plaintiff—or for transportation supervisors and dispatch, over whom Mr. Kim admits he exercised supervisory authority. (Doc. 46-3 at 70, Kim Depo. 7:24- 8:10)  Further, while Kim acknowledged he "wrote up the discipline" for Plaintiff being away from her coach for over an hour, he submitted it "to Candra Cheers to review."  (Doc. 46-3 at 83, Kim Depo. 24:7-11).  Ms. Cheers reported that it was her responsibility "to decide wither GET employees who are subject to termination under GET's progressive discipline policy should be terminated and to participate in the proceedings leading up to that decision."  (Doc. 43-5 at 1, Cheers Decl. ¶ 2)  Though Ms. Cheers accepted the investigation conducted by Mr. Kim, she also viewed the videotape of the December 26, 2013 and then, according to Ms. Cheers, it was her decision alone to terminate Plaintiff's employment with GET.  (*Id.* at 4, ¶ 24)  Thus, even though Kim acted for GET in conducting the investigation, it was Ms. Cheers who acted in the interest of her employer, in this instance.

      Moreover, as Defendants observe, Kim's recommendation that Plaintiff be disciplined is not

sufficient to find Kim is an "employer" for under the FMLA.  Previously, the Court observed that individuals may be supervisors and managers who "set … schedules, assisted in the drafting of employee handbooks, …*recommended or reviewed the termination of other employees*, and maintained employment records"—and yet not be "employers" under the meaning of the Act because they did not "control the purse strings" over the plaintiff's position.  *Baird v. Kessler*, 172 F. Supp. 2d 1305, 1311 (E.D. Cal. 2001) (emphasis added).  Here, at most, the evidence shows Kim submitted the Employee Discipline Report to Cheers, who made the ultimate decision to terminate Plaintiff after finding she committed five violations of GET policies in the twelve-month period.  (Doc. 43-5 at 4, Cheers Decl. ¶¶ 21, 24).  The evidence does not show that Kim was responsible for hiring or firing Plaintiff, that he supervised the day-day-operations for bus drivers, determined her rate of pay, or was responsible for maintaining her employment records at GET.

Accordingly, applying the "economic realities" test, the Court finds Plaintiff has not demonstrated that Toddash Kim was Plaintiff's "employer" within the meaning of the FMLA.  *See Bonnette*, 704 F.2d at 1470.  Thus, Plaintiff fails to establish the existence of an element essential to her claim against Kim for interference with her rights under the FMLA.  *See* 29 U.S.C. § 2615(a).  Thus, Defendants' motion for summary adjudication of the FMLA claim against Kim is **GRANTED**.  *See Celotex*, 477 U.S. at 322.

### 2.    Liability of GET

The Ninth Circuit determined that when "an employee is subjected to 'negative consequences… simply because he has used FMLA leave,' the employer has interfered with the employee's FMLA rights." *Liu*, 347 F.3d at 1136 (quoting *Bachelder*, 259 F.3d at 1124).  Thus, to establish a claim for interference with rights, "a plaintiff must show that (1) he took 'FMLA-protected leave'; and (2) it constituted 'a negative factor' in an adverse employment decision. *Jadwin v. County of Kern*, 610 F. Supp. 2d 1129, 1159 (E.D. Cal. 2009) (citing *Bachelder*, 259 F.3d at 1125).  Here, there is no dispute that Plaintiff took leave protected under the FMLA or that she suffered an adverse employment action.  However, the parties disagree whether Plaintiff is able to establish the protected leave was a "negative factor" in the decision to terminate her employment with GET.

To support a claim for a violation of the FMLA, a plaintiff must supply direct or indirect

1  evidence, or both, of the violation. *Bachelder*, 259 F.3d at 1125; *Jadwin*, 610 F. Supp. 2d at 1159.

2  Direct evidence typically consists of statements or actions by the employer. *See Coghlan v. Am.*

3  *Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005). Indirect evidence "requires an additional

4  inferential step." *Id.* A "close temporal proximity" between an employee taking leave and being

5  terminated may support an inference of unlawful interference. *See Liu*, 347 F.3d at 1137 (citing

6  *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir. 1998) (holding that the "close temporal

7  proximity between two events may give rise to an inference of causal connection").

8       Defendants argue Plaintiff is unable to show a causal connection, because "the process leading

9  to plaintiff's termination had begun over 8 months prior to her injury and 80% of the violations

10 occurred prior to that time." (Doc. 43-1 at 9) As Defendants observe, the Ninth Circuit opined "an

11 employer is not required to cease pursuing a disciplinary course of action against an employee that

12 began before that employee took FMLA-related leave, simply because that employee took leave." (*Id.*

13 at 9-10, quoting *Swan v. Bank of America*, 360 Fed. Appx. 903, 906 (9th Cir. 2009). Therefore,

14 Defendants contend "the fact that the final decision was made shortly after [P]laintiff was injured is

15 insufficient to create a triable issue of fact." (Doc. 43-1 at 9)

16       In *Swan*, the plaintiff argued that "she had a 'stellar' employment history," and was targeted

17 "with frivolous disciplinary measures only after she gave notice of her intent to take FMLA-related

18 leave." *Id.*, 360 Fed. Appx at 906. Despite this claim, the Court found the record belied the Plaintiff's

19 assertion about her work performance, because "there [was] ample documentation of her performance

20 problems long before she gave notice of her intent to take FMLA-related leave." *Id.* In addition, the

21 Court found the plaintiff was not able to "establish that her termination is causally related to her leave"

22 because she was terminated "four months after her return from leave." *Id.* The Court found the four

23 month delay between the leave and adverse employment action "was too remote in time to support a

24 finding of causation premised solely on temporal proximity." *Id.* (citing *Clark County Sch. Dist. v.*

25 *Breeden*, 532 U.S. 268, 273 (2001) (explaining in the context of a Title VII claim that "cases that

26 accept mere temporal proximity between an employer's knowledge of protected activity and an adverse

27 employment action as sufficient evidence of causality to establish a prima facie case uniformly hold

28 that the temporal proximity must be 'very close'").

15

However, this Court has held that temporal proximity between the taking of protected leave and the adverse actions by the employer bears on the "negative factor" analysis. *Sutton v. Derosia*, 2012 WL 4863788, at *13 (E.D. Cal. Oct. 12, 2012) ["The temporal relationship is significant because the Ninth Circuit has held that the proximity in time between the taking of FMLA leave and an adverse employment action 'provides supporting evidence of a connection between the two events.'"]; *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) ("causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity")). Notably, in *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1137 (9th Cir. 2003), the Court held, "[T]he proximity in time between the leave and her termination also provides supporting evidence of a connection between the two events."

It is undisputed Plaintiff received several Employee Discipline Reports for violations before taking her FMLA leave.  However, Plaintiff presents evidence that though she missed a safety meeting in November, she was informed that she could attend a makeup session and the violation would not count against her on GET's progressive discipline process.  (Doc. 46-3 at 40-41, Johnson Depo. 83:23-84:10).  Indeed, Ms. Cheer confirms this was the understanding provided to the plaintiff, though she iterates that she did not *promise* that if the makeup session was not provided by GET that the discipline report would not count toward termination.  (Doc. 46-3 at 101-102)

Notably, after Plaintiff took FMLA leave, she was not permitted to attend a makeup session and she was informed the day she returned to work that she had committed five violations—including that the missed safety meeting counted against her on the disciplinary track.  Moreover, as discussed below, there is a question of fact whether Plaintiff committed the fifth violation identified by GET on its "five step discipline track." Indeed, it appears that GET no longer contends that the plaintiff left the bus unattended for over an hour.  Thus, the evidence before the Court shows the adverse decisions by GET to count the missed meeting as a basis for termination and to terminate Plaintiff's employment for leaving the bus unattended for an hour, were made "on the heels" of her taking FMLA leave.  *See Villiarimo*, 281 F.3d at 1065.

On the other hand, GET argues that there can be no liability on the interference claim because from July 2014, Plaintiff was unable to return to work as a bus driver or a driver of a vehicle that

requires a Class B license because her knee was and is in very bad condition." (JSF 16, 17)  The plaintiff argues, however, this is irrelevant because, "Plaintiff has alleged that she was terminated because she took leave that qualified under the FMLA/CFRA, not that defendant refused to reinstate her at the end of her leave . . ." (Doc. 46 at 10) The Court agrees.  The fact that GET would not have been required to reinstate Plaintiff to her bus driver job at the end of her leave, had she been unable to return to it, is irrelevant to the undisputed facts that Plaintiff's FMLA leave did not expire.  Rather, GET required Plaintiff to return from FMLA leave and placed her into a modified, light duty position. In short, though GET could have refused to reinstate the plaintiff when she completed FMLA leave— had this been the facts confronting it—this has no bearing on whether GET interfered with her taking leave protected by the FMLA and CFRA.

Taking the evidence in the light most favorable to Plaintiff, as the Court is obligated to do on a motion for summary judgment, the Court must find the close proximity in time supports an inference that the protected leave was a "negative factor" in the decision to terminate Plaintiff's employment with GET.  *See Liu*, 347 F.3d at 1137; *Hodgens*, 144 F.3d at 168.  Accordingly, Defendants' motion for summary adjudication of the FMLA claim against GET is **DENIED**.

## B.    Discrimination in Violation of the CFRA

Plaintiff contends GET is liable for discrimination based upon her request for leave in violation of the California Family Rights Act (Doc. 1 at 4), which is the state counterpart to the FMLA.  *Weeks v. Union Pac. R.R. Co.*, 137 F. Supp.3d 1204, 1230 (E.D. Cal. 2015) (citing *Rogers v. County of Los Angeles*, 198 Cal.App.4th 480, 487 (2011)).  Significantly, as observed by the Ninth Circuit, "CFRA adopts the language of the FMLA and California state courts have held that the same standards apply." *Liu*, 347 F.3d at 1132 n.4 (citing *Dudley v. Dep't of Transp.*, 90 Cal. App. 4th 255, 261 (2001)); *see also Lew v. Superior Ct.*, 348 Fed. Appx 227, 229 (9th Cir. 2009) ("The CFRA adopts the same language as the FMLA, and California state courts have held that the same standards apply; therefore, this memorandum will treat both causes of action together").

Because the Court determined summary adjudication of the FMLA claim is not appropriate against GET, given the close proximity in time between Plaintiff taking leave and the termination of her employment, summary adjudication of the CFRA claim is likewise not appropriate.  Accordingly,

1    Defendants' motion as to the second cause of action is **DENIED**.

2        **C.**    **Violations of FEHA**

3           Plaintiff contends that pursuant to California's Fair Employment and Housing Act, which

4    prohibits discrimination on the basis of a disability, GET "was barred from discharging [Plaintiff] from

5    employment and discriminating against her in terms, conditions or privileges of employment." (Doc. 1

6    at 4-5) In addition, Plaintiff asserts, "GET had an affirmative obligation to reasonably accommodate

7    Plaintiff, a disabled person." (*Id.* at 5) Finally, Plaintiff contends GET also violated FEHA by failing

8    to take reasonable steps to prevent discrimination. (*Id.* at 6) Thus, Plaintiff's claims for violations of

9    FEHA are based upon disability discrimination, failure to prevent the discrimination, and the failure to

10   accommodate her disability.

11             1.    Shifting burdens and the *McDonnell Douglas* framework

12          Plaintiff's claims under FEHA involve the shifting of burdens articulated by the Supreme

13   Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *See Guz v. Bechtal*

14   *National Inc.*, 24 Cal.4th 317, 354 (2000) ("Because of the similarity between state and federal

15   employment discrimination laws, California courts look to pertinent federal precedent when applying

16   our own statutes").

17          First, the plaintiff bears the burden to establish a prima facie case of a violation of FEHA.

18   *McDonnell Douglas Corp.*, 411 U.S. at 802; *Hawn v. Executive Jet Mgmt., Inc.*, 615 F.3d 1151, 1155

19   (9th Cir. 2010). The evidence may be either direct or circumstantial, and the amount that must be

20   produced to create a prima facie case is "very little." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S.

21   248, 253 (1981). If a plaintiff establishes a prima facie case, "the burden of production, but not

22   persuasion, then shifts to the [defendant] to articulate some legitimate, nondiscriminatory reason for the

23   challenged action." *Hawn*, 615 F.3d at 1155; *see also McDonnell Douglas Corp*, 411 U.S. at 803. If

24   the defendant carries this burden, the inquiry does not end. Rather, the burden shifts back to the

25   plaintiff to demonstrate the reasons proffered by defendant are pretextual. *Id.*; *McDonnell Douglas*

26   *Corp*, 411 U.S. at 805. Consequently, the plaintiff has "the ultimate burden of persuading the trier of

27   fact that the defendant intentionally discriminated against [her]." *Reeves v. Sanderson Plumbing*

28   *Products, Inc*. 530 U.S. 133, 142 (2000).

2.      Application

FEHA requires employers "to make reasonable accommodation for the known physical or mental disability of an applicant or employee" and "to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition." Cal. Gov. Code §12940 (m) and (n). In addition, it is an unlawful employment practice under FEHA "for an employer . . . to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring" in the workplace. Cal. Govt. Code § 12940(k).  Here, Plaintiff contends that GET failed to meet satisfy the obligations to accommodate her disability and prevent discrimination.

a.      *Plaintiff's prima facie case*

"A prima facie case for discrimination on grounds of physical disability under the FEHA requires plaintiff to show: (1) he suffers from a disability; (2) he is otherwise qualified to do his job; and, (3) he was subjected to adverse employment action because of his disability." *Faust v. Cal. Portland Cement Co.*, 150 Cal. App. 4th 864, 886 (2007) (citations omitted). *see also Scotch v. Art Inst. of California-Orange Cnty., Inc.*, 173 Cal. App. 4th 986, 1009-10 (2009) ("elements of a failure to accommodate claim are (1) the plaintiff has a disability under the FEHA, (2) the plaintiff is qualified to perform the essential functions of the position, and (3) the employer failed to reasonably accommodate the plaintiff's disability").  Here, Defendants do not dispute that Plaintiff has a disability as defined by FEHA, but argue Plaintiff fails to state a prima facie case because she is unable to perform the job duties of a bus driver.  (Doc. 43-1 at 10-11)

Significantly, at the time Plaintiff was terminated, GET received notice that Plaintiff was "released to temporary alternate work."  (Doc. 46-3 at 20)  The company determined Plaintiff was able to perform "modified duty assignments …within [the] physician's guidelines," which included training on new routes, attending orientation meetings and staffing GET's transit stations where she would "pass out flyers, information, give route information.".  (*Id.* at 20, 149)  Thus, the evidence before the Court indicates that, despite the fact GET was aware Plaintiff was unable to drive, she remained qualified to work modified duties under GET's program to allow employees "to remain safely in the

19

workforce while…recovering from [a] medical condition." (*See id.*)  Nevertheless, Plaintiff was not given the opportunity to start the modified work, because she was suspended the same day from work, pending the disciplinary meeting.  Accordingly, the Court finds Plaintiff states a prima facie case for discrimination and failure to accommodate her knee injury.

b.   *Legitimate reason*

Once Plaintiff has established a prima facie case, the burden of production shifts to GET "to articulate some legitimate, nondiscriminatory reason for the challenged action."  *Hawn*, 615 F.3d at 1155.  Under FEHA, a defendant must identify "reasons that are facially unrelated to prohibited bias," but the articulated reasons "need not necessarily have been wise or correct."  *Guz*, 24 Cal.4th at 358.

GET argues it had a legitimate business reason for terminating Plaintiff due to her violations of GET policies.  The company employs a five-step discipline policy, under which GET has the right to terminate an employee who "has violations in a particular track within a floating 12 month period." (JSF 12)  In the termination letter, GET indicated Plaintiff reached five violations with the following Employee Discipline Reports dated March 2013 through January 2014:

- 03/31/13- Operator failed to report for work or call in
- 10/04/13- Operator was five minutes late for duty
- 10/12/13- Operator failed to give an hour notice before calling in and showed up 2 ½ hours late.
- 11/1/13-11/1/13- Operator failed to attend one of seven mandatory safety meeting[s].
- 01/09/14- Operator drove to an apartment complex and left the paratransit bus unattended for over an hour.
- 

(Doc. 43-5 at 194)  In light of these violations, and the fact that Plaintiff did not grieve the violations under the Collective Bargaining Agreement[2], GET maintains it was proper for Plaintiff to be terminated.

Significantly, however, there is a question as to whether the fifth violation actually occurred, and whether it was a proper basis for termination.  Plaintiff contends she drove to the apartment complex and left the bus unattended for only seventeen minutes, and remained by the bus during the

---

[2] Notably, however, the CBA does not allow the employee to grieve; this right is reserved to the union.  Failing this, the employee has no right to grieve.  (Doc. 43-4 at 218 ["Q. . . [C]an the employee [notwithstanding the union's agreement] themselves, file a grievance? A No."]

balance of her "down time." (Doc. 46-2 at 3, Johnson Decl. ¶ 5)  In addition, Ms. Cheers testified that she reviewed the video of the December 26, 2013, and saw Plaintiff drive to the apartment parking lot, leave the bus, and return "a few minutes later." (Doc. 46-3 at 126- 127, Cheers Depo. 59:16- 60:13) Thus, the assertion that Plaintiff left the bus unattended for an hour is not supported by the evidence. On the other hand, the Employee Disciplinary Report also indicated Plaintiff "parked in a no parking area" (Doc. 43-4 at 43) and Ms. Cheers testified that Plaintiff parked in "an unauthorized, like a red zone or no-parking location" (Doc. 46-3 at 126- 127, Cheers Depo. 59:16- 60:13) However, it is unclear whether this parking location was not, in fact, "unauthorized" because Plaintiff reports she received permission to park in the location.  (*See* Doc. 46-2 at 3, Johnson Decl. ¶ 5)

Moreover, Plaintiff presents evidence that despite the written *policy* to not leave the bus, she was trained that in *practice*, it was permitted when her trainer had them stop at a restaurant "where [they] were gone from the bus for approximately an hour." (Doc. 46-2 at 2-3, Johnson Decl. ¶ 3) Further, Plaintiff contends she observed other drivers "stopping at stores, restaurants, and on streets during their down times between customers." (*Id.* at 4, ¶ 6)  Given the conflicts in the evidence presented by Plaintiff and Defendants, the Court is unable to determine whether, and to what extent, Plaintiff violated GET policies on December 26.  Thus, GET fails to demonstrate it had a legitimate business reason for terminating Plaintiff for five violations under its disciplinary process.

### c.    Pretext

Even assuming GET carried the burden to articulate a legitimate, nondiscriminatory reason for terminating Plaintiff's employment, Plaintiff maintains the burden to "raise a triable issue of material fact as to whether the defendant's proffered reasons . . . are mere pretext." *See Hawn*, 615 F.3d at 1155-56.

Under FEHA, a plaintiff can demonstrate pretext with direct or indirect evidence.  *Vasquez*, 349 F.3d at 641; *Coghlan*, 413 F.3d at 1094-95.  As discussed above, the timing of the adverse employment decisions—both to count Plaintiff's missed safety meeting as violation on the five-step program and to terminate Plaintiff's employment— supports an inference that the decisions were related to Plaintiff's disability.  *See Liu*, 347 F.3d at 1137; *Hodgens*, 144 F.3d at 168.  Accordingly, Plaintiff carries the burden to show a triable issue of fact as to whether the actions taken by GET were

pretextual, and Defendants' motion for summary adjudication of Plaintiff's FEHA claims is **DENIED**.

**V.      Conclusion and Order**

As discussed above, Defendants carry their burden to demonstrate Plaintiff is unable to succeed upon her claim for a violation of the FLMA against Defendant Kim.  However, Defendants have not carried their burden to show an absence of a genuine issue of material fact related to Plaintiff's claims against GET.  *See Celotex,* 477 U.S. at 323.  A jury must make credibility determinations and resolve the conflicts between the evidence.  *See T.W. Electrical Serv., Inc.*, 809 F.2d at 630.

Based upon the foregoing, **IT IS HEREBY ORDERED**:

1.      Defendants' motion for summary adjudication of the FMLA claim against Toddash Kim is **GRANTED**; and

2.      Defendants' motion for summary adjudication of the FMLA, CFRA, and FEHA claims against Golden Empire Transit District is **DENIED**.

IT IS SO ORDERED.

Dated:   __July 25, 2016__                        _____/s/ Jennifer L. Thurston__
                                                                  UNITED STATES MAGISTRATE JUDGE